1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                             OAKLAND DIVISION

9
10  CHARLES BURDEN, individually and on         Case No: C 10-05966 SBA
    behalf of other persons similarly situated,
11                                              **ORDER GRANTING IN PART AND
             Plaintiff,                         DENYING IN PART
12                                              DEFENDANT'S MOTION FOR
         vs.                                    SUMMARY JUDGMENT**
13  SELECTQUOTE INSURANCE SERVICES,             Dkt. 34
    a California corporation; and DOES 1 through
14  10,
15           Defendants.

16

17       Plaintiff Charles Burden ("Burden") filed the instant putative wage and hour class

18  action against his former employer, SelectQuote Insurance Services ("SelectQuote"),

19  alleging that he and other SelectQuote insurance agents were misclassified as exempt from

20  state and federal overtime laws.  The parties are presently before the Court on

21  SelectQuote's Motion for Summary Judgment.  Having read and considered the papers

22  filed in connection with this matter, and being fully informed, the Court hereby GRANTS

23  SelectQuote's motion as to Burden's first cause of action and DENIES the motion in all

24  other respects.  The Court, in its discretion, finds this matter suitable for resolution without

25  oral argument.  See Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).

26
27
28

## I. BACKGROUND

### A. FACTUAL OVERVIEW

The parties concede that there are no material disputes of fact in this case. See Reply at 1, Dkt. 57; Pl.'s Mot. for Class Certification at 7, Dkt. 28. The salient facts are summarized below only insofar as they are relevant to the Court's determination of whether SelectQuote is entitled to judgment as a matter of law.

#### 1. The Parties

SelectQuote is an independent life insurance sales agency founded in San Francisco in 1984. Singh Decl. ¶ 3, Dkt. 35. According to SelectQuote, it radically changed the manner in which term life insurance policies are marketed and sold. Traditionally, such policies were offered through captive life insurance agents who worked exclusively for the insurance companies that employed them. Id. ¶ 5. These agents were responsible for developing their own sales leads, and selling policies through in-home, face-to-face transactions. Id. SelectQuote claims it changed the method of selling term life insurance policies by applying the direct marketing approach used for property and casualty insurance policies. Id. ¶¶ 4-5. Using internally-generated sales leads, SelectQuote agents contact prospective customers by telephone, as opposed to in person. Id. ¶ 5.

Burden worked as a SelectQuote insurance sales agent from approximately March 2004 until January 26, 2009. Answer ¶ 6, Dkt. 23. During the course of his employment, Burden's compensation was governed by two versions of SelectQuote's Agent Variable Compensation Plan (the "Variable Plan"). First Kubin Decl. Ex. 1 ("Burden Dep.") at 70:12-71:19, Dkt. 37. Agents working under the Variable Plan were classified as exempt from California and federal overtime laws, and were allowed to work overtime. Id. Ex. 2 ("Malik Dep.") at 41:4-42:8. At all relevant times while Burden worked under the Variable Plan (i.e., from the beginning of the limitations period on February 9, 2006 until his termination on January 26, 2009), his total earnings exceeded one and one-half times the applicable California and federal minimum wages. Compare Burden Dep. at 117:17-118:8, 119:13-121:20, with Industrial Welfare Commission, History of California Minimum

Wage, available at http://www.dir.ca.gov/iwc/minimumwagehistory.htm, and Wage and Hour Division, U.S. Dep't of Labor, History of Federal Minimum Wage Rates Under the Fair Labor Standards Act, 1938-2009, http://www.dol.gov/whd/minwage/chart.htm.

### 2. SelectQuote's Agent Variable Compensation Plan

#### a) The 2005 Plan

While employed by SelectQuote, Burden worked under two versions of the Variable plan, one adopted in 2005 (the "2005 Plan") and the other adopted in 2007 (the "2007 Plan"). Burden worked under the 2005 Plan from February 9, 2006, through March 31, 2007. Malik Decl. ¶¶ 4, 6. Under the 2005 Plan, agents such as Burden received incentive pay for each "in force" policy sold. Second Kubin Decl. Ex. A at 10, Dkt. 42. Although there were various adjustments based on performance and the type of lead generating the sale, an agent's incentive pay was essentially calculated as a percentage amount of the monthly premiums for the in-force policies the agent has sold. Id. at 10-11. Agents also could qualify for additional flat-fee incentive compensation for every in-force "Globe" policy sold. Id. at 6-8.

All SelectQuote agents participating in the 2005 Plan received a monthly draw of $3,333.33 ($40,000 per year). Id. at 2. Recognizing the lengthy insurance application process and the amount of time before a policy becomes "in force," SelectQuote paid its agents an advance (referred to as an "ARS Advance") for every application where a completed medical exam had been received by the carrier. Id. at 1. To calculate the ARS Advance, SelectQuote created a table listing eleven types of leads (i.e., advertising calls, web e-mails, etc.), with an assigned dollar value for each type of lead. Id. at 4. To determine an agent's ARS Advance for a given month, SelectQuote would first multiply the assigned value for a given lead type by the number of sales generated by the particular type of lead. Id. at 3-4. From this aggregate sum, SelectQuote subtracted the $3,333.33 monthly draw previously paid to the agent. Id. at 2. As long as the earned ARS Advance exceeded the draw, the agent kept the excess. See id. If the monthly draw exceeded the ARS Advance, SelectQuote recouped the difference. See id. at 2, 21.

In addition to reconciling the ARS Advances with the monthly draw, SelectQuote later reconciled the ARS Advances with the actual commission the agent earned on in-force policies. Malik Dep. at 67:17-68:4; Malik Decl. ¶ 9. If the commission earned exceeded the ARS Advance, SelectQuote paid the agent the difference. See Second Kubin Decl. Ex. B at 11, Dkt. 42. But if the ARS Advance exceeded the commission earned, SelectQuote recouped the difference. See id.; Malik Dep. at 67:17-68:4. After SelectQuote recouped any unearned portions of an agent's monthly draw and ARS Advances, the agent's actual compensation would reflect earned percentage commissions on in-force premiums plus any unrelated components of compensation. See Malik Dep. at 67:17-25; Malik Decl. ¶ 9.[1]

### b) The 2007 Plan

Burden worked under the 2007 Plan from April 1, 2007, until SelectQuote terminated his employment on January 26, 2009. See Malik Decl. ¶¶ 6-8. The 2007 Plan continued to advance agents a monthly draw. Second Kubin Decl. Ex. F at 1, Ex. G at 1, Dkt. 42. However, the 2007 Plan eliminated the ARS Advances. Malik Decl. ¶ 9; Burden Dep. at 110:14-19. Rather than paying out ARS Advances and later reconciling them with percentage commissions, the 2007 Plan simply paid out a monthly commission for each policy sold the previous month. Malik Decl. ¶ 9; Second Kubin Decl. Ex. F at 1, Ex. G at 1. The percentage commissions paid under the 2007 Plan were essentially identical to those paid under the 2005 Plan, Malik Decl. ¶ 9, and the 2007 Plan reconciled the draw with earned commissions on a monthly basis, Second Kubin Decl. Ex. F at 1, Ex. G at 1.

### B. PROCEDURAL HISTORY

On February 19, 2010, Burden filed a class action lawsuit against SelectQuote in San Francisco County Superior Court. Notice of Removal ("Removal") Ex. A at 10, Dkt. 1. He alleged that SelectQuote improperly classified its sales agents as exempt from California overtime laws and sought restitution and statutory penalty damages. Id. at 14-18. On December 3, 2010, Burden filed his First Amended Complaint (the "FAC"). Id. at

---

[1] Unrelated compensation would include flat fee commissions for Globe policies, bonuses, paid time off, and the like. See Malik Decl. Exs. 1-4, Dkt. 36.

- 4 -

315, Dkt. 1-4.  The FAC avers four causes of action: (1) failure to pay overtime wages owed under California Labor Code section 510 and California Industrial Welfare Commission Wage Order 4-2001 ("Wage Order 4-2001"), (2) failure to pay overtime wages owed under 29 U.S.C. § 207 in violation of California's unfair competition law, (3) failure to pay all wages owed upon termination under California Labor Code sections 201 or 202, and (4) unfair competition under California Business and Professions Code section 17200.  Id. at 320-24.

SelectQuote removed the action to this Court on December 30, 2010, Removal ¶ 1, and it answered the FAC on April 18, 2011, Answer at 1.  Burden filed a Motion for Class Certification on May 25, 2011.  Pl.'s Mot. for Class Certification.  SelectQuote filed a Motion for Summary Judgment less than a week later.  Mot. Summ. J. ("Mot."), Dkt. 34.  On July 19, 2011, the Court issued an order holding Burden's Motion for Class Certification in abeyance pending adjudication of SelectQuote's Motion for Summary Judgment.  Order Re-setting Hearings at 3, Dkt. 50.  Burden filed his Opposition to SelectQuote's Motion for Summary Judgment on August 5, 2011.  Opp'n, Dkt. 53.  SelectQuote filed a redacted Reply on August 23, 2011.  Redacted Reply.  The parties have fully briefed the Motion for Summary Judgment, and it is ripe for adjudication.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  Where, as here, there is no genuine dispute as to any issue of material fact, see Pl.'s Mot. for Class Certification at 7, the Court may grant summary judgment or partial summary judgment as to any cause of action if the moving party is entitled to judgment as a matter of law, see Fed. R. Civ. P. 56(a); see also Smith v. Califano, 597 F.2d 152, 155 n.4 (9th Cir. 1979) (finding summary judgment appropriate where parties agreed on material facts and dispute rested on interpretation of statutes and regulations).

## III. DISCUSSION

### A. CALIFORNIA OVERTIME CLAIM

Burden's first cause of action alleges that SelectQuote violated California Labor Code section 510 and California Wage Order 4-2001 by failing to pay overtime wages to him and other SelectQuote agents participating in the 2005 Plan. FAC ¶¶ 16-17. California law generally requires overtime pay for employees who work in excess of eight hours in a workday or forty hours in a workweek. Cal. Lab. Code § 510(a); 8 Cal. Code Regs. § 11040(3)(A). Those requirements, however, do not apply to any employee (1) "whose earnings exceed one and one-half (1½) times the minimum wage," if (2) "more than half (½) of that employee's compensation represents commissions." 8 Cal. Code Regs. § 11040(3)(D).

SelectQuote argues that it properly classified Burden as exempt from California overtime laws. Mot. Summ. J. at 10-14. Courts construe narrowly the exemptions from California's "statutory mandatory overtime provisions," and SelectQuote bears the burden of proving Burden was properly classified. See Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 794-95 (1999). As set forth below, the Court finds that SelectQuote has satisfied its burden and that it is entitled to summary judgment on Burden's first cause of action.

#### 1. One and One-Half Times the Minimum Wage

It is undisputed that Burden's earnings exceeded one and one-half times the California minimum wage during the period he worked under the 2005 Plan. In 2006, California's minimum wage was $6.75 per hour. Industrial Welfare Commission, History of California Minimum Wage, available at http://www.dir.ca.gov/iwc/minimumwage history.htm. In 2007, California's minimum wage increased to $7.50 per hour. Id. Burden concedes that his compensation under the 2005 Plan was effectively $10.13 per hour for 2006 and $11.25 per hour for 2007—amounts which exceed one and one-half times the minimum wage in effect at that time. See Burden Dep. at 118:6-8, 120:2-5. Therefore, SelectQuote has established the first element required to prove that Burden was exempt from California's overtime pay requirements. See 8 Cal. Code Regs. § 11040, subd. 3(D).

**2.    More Than Half of the Compensation Constituted Commissions**

The parties' dispute centers on the second element for the overtime exemption; namely, whether more than half of Burden's compensation represents "commissions." See id. In California, "[c]ommission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Cal. Lab. Code § 204.1; see also Ramirez, 20 Cal. 4th at 803. Burden does not dispute that SelectQuote paid him for services rendered in the sale of its property or services, but instead, challenges whether SelectQuote paid him "commissions" as defined in California Labor Code section 204.1. See Opp'n at 4-6.[2]

As established above, "commissions" must be based proportionately on the "amount or value" of the property or services an employee sells. See Cal. Lab. Code § 204.1. In order to be a commission based proportionately upon "value," see Cal. Lab. Code § 204.1, compensation "must be a percent of the price of the product or service," see Keyes Motors, Inc. v. Div. of Labor Standards Enforcement, 197 Cal. App. 3d 557, 563 (1987). A commission is based proportionately upon an "amount" where an employer pays an employee a uniform fee for each unit of property or service sold. See Areso v. Carmax, Inc., 195 Cal. App. 4th 996, 1006-09 (2011), pet'n for review denied, No. S194365, slip op. at 1 (Cal. Aug. 31, 2011).

Here, the record establishes that Burden's incentive compensation under the 2005 Plan was calculated based on a percentage of the premiums of the policies he sold that became "in force," i.e., policies for which SelectQuote's customers began to make monthly premium payments. Burden counters that his incentive compensation was not a

---

[2] SelectQuote contends that Burden implicitly conceded that he was paid commissions under the 2007 Plan when he filed the FAC, which withdrew his challenge to the 2007 Plan under California law. Mot. at 11. According to SelectQuote, because the percentage-based commissions under the 2005 and 2007 plans are essentially identical, it "necessarily follows" that SelectQuote paid Burden commissions under the 2005 Plan. Id. This argument has no merit. SelectQuote cites no authority suggesting that Burden "necessarily" conceded anything by withdrawing his state-law challenge to the 2007 Plan. See id. Indeed, even if Burden had made some sort of concession as to the 2007 Plan, he has explicitly argued that he is making no concessions with respect to the terms of 2005 Plan. See Opp'n at 6.

1  commission because it was based on a "fixed" sum which, in turn, was based on the type of
2  lead that generated the sale.  Opp'n at 5.  The flaw in Burden's argument is that it
3  mischaracterizes how the ARS Advance works.  As its name implies, the ARS Advance is
4  an *advance payment* on the agent's commission—but itself is *not the actual commission.*
5  As discussed, SelectQuote paid agents advances on actual commissions due to the lengthy
6  sales cycle for the sale of insurance.  The ARS Advances were later reconciled with the
7  actual commissions earned by Burden—the net result of which could either be a positive
8  adjustment for Burden or a negative chargeback in which SelectQuote recouped any
9  unearned commissions.  See Malik Dep. at 67:17-25.[3]  Since the amount of the commission
10 was tied directly to the amount of the sale of the policy, it is clear that such payments meet
11 the definition of a "commission" under Keyes.
12      Even assuming arguendo that Burden's ARS Advances constituted his actual
13 commissions—which they did not—the advances nevertheless satisfy the definition of
14 "commission" for purposes of California's overtime laws.  See Areso, 195 Cal. App. 4th at
15 1006-09.  In Areso, the court noted that California Labor Code section 204.1 requires
16 commission wages to be "based proportionately upon the amount *or* value" of the property
17 or services sold."  Id. at 1006 (emphasis in original).  Because Keyes defined
18 proportionality based only on "value," the Areso court interpreted section 204.1's reference
19 to the term "amount" as an issue of first impression.  Id. at 1007.  The court held that
20 commission wages could also be "based proportionately on the *amount* (number) of
21 property or services sold by the employee."  Id. (emphasis in original).[4]  Applying this
22

---

23  [3] The compensation SelectQuote paid Burden in Globe commissions, bonuses, and paid time off is negligible in the determination of whether greater than half of his income
24  derived from commissions under California law.  See Malik Decl. ¶¶ 4, 6 & Exs. 1-2.

25  [4] Areso suggests in dicta that a flat payment per amount of property or services sold would constitute commission compensation even under Keyes's percentage requirement:
26  "[W]e note that nothing in section 204.1 or in the case law requires . . . a commission which remains fixed regardless of the price of the item.  In that light, we point out that the uniform
27  payment [the plaintiff] received for each vehicle sold *was* unarguably a 'percentage,' albeit variable, of the sales price of each vehicle."  195 Cal. App. 4th at 1008 n.10 (emphasis in
28  original).

newly-announced rule, the court held that an automobile dealer paying salespersons a "uniform fee" for each vehicle sold satisfied the proportionality requirement under section 204.1. Id. at 1008. The court noted that the amount of compensation would rise and fall with each vehicle sold in a one to one proportion. Therefore, the court concluded that a uniform payment for each vehicle sold constituted commission compensation under section 204.1. Id. at 1009.

Under Burden's interpretation of the Plan, ARS Advances are precisely the type of "uniform fee" for each unit of property or service sold that Areso held to constitute commission compensation. See id. at 1006-09. For each policy sold, SelectQuote paid Burden a uniform ARS Advance based on the type of lead that generated the sale. Burden argues that the Court should not apply Areso to his case, as Areso "would allow every fixed amount of incentive compensation per lead type or Globe policy to be a 'commission.'" Opp'n at 6. He is partially correct, as Areso does just that. See 195 Cal. App. 4th at 1006 ("commission wages may be based proportionately on the amount (number) of property or services sold by the employee"). But Burden is incorrect in suggesting that this renders section 204.1's proportionality requirement meaningless. See Opp'n at 6. Rather, as Areso points out, compensation will rise or fall in direct proportion to the number of sales made. See 195 Cal. App. 4th at 1008.

Having established that Burden's commissions include his reconciled ARS Advances and monthly draw plus any additional commission paid after reconciliation, the Court must now determine whether those payments constitute greater than half of Burden's total compensation. See Cal. Code Regs., tit. 8, § 11040, subd. 3(D). They clearly do. From February 9, 2006—the beginning of the limitations period—through December 31, 2006, nearly eighty-eight percent of Burden's total earnings came from commissions. Malik Dep. ¶ 4. From January 1, 2007, through March 31, 2007—the last day Burden worked under the 2005 Plan—nearly sixty percent of his total earnings came from commissions. Id. ¶ 6.

In sum, SelectQuote has demonstrated that it properly classified Burden as exempt

under Wage Order 4-2001. See Cal. Code Regs., tit. 8, § 11040(3)(D). At all relevant times, his earnings exceeded one and one-half times the California minimum wage, and greater than half of his total compensation came from commissions. Cf. id. Therefore, SelectQuote is entitled to summary judgment on Plaintiff's first cause of action. See Fed. R. Civ. P. 56(a).

### B.    FLSA CLAIM

Burden's second cause of action alleges that SelectQuote violated the FLSA by misclassifying him and other agents working under the 2005 and 2007 Plans as exempt employees. FAC ¶ 22-23. The sole issue presented with respect to Burden's FLSA claim is whether SelecQuote is entitled to seek the shelter of the "retail or service establishment" exemption afforded under 29 U.S.C. § 207(i).[5] Before delving into this issue, however, it is helpful to briefly review the genesis of the FLSA and this particular exemption.

#### 1.    Overview of the FLSA

Enacted by Congress in 1938, the FLSA requires employers to pay employees a regular hourly rate for up to forty hours a week and overtime compensation at a rate of one and one-half times the regular rate for hours worked in excess of forty. See 29 U.S.C. § 207(a)(1). At the time of its enactment, the FLSA contained a now-repealed exemption for "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." 29 U.S.C. § 213(a)(2) (repealed by Pub. L. No. 101-157 (1989)). Although the Act did not define "retail or service establishment," in 1941, the Department of Labor ("DOL") issued an interpretive bulletin regarding the scope and applicability of § 213(a)(2). See In re Wells Fargo Home Mortg. Overtime Pay Litig., No. C 06-1770 MHP, 2008 WL 2441930, *3 (N.D. Cal. June 13, 2008) (tracing history of

---

[5] At all relevant times, the applicable minimum wage under section 6 of the FLSA was lower than the applicable California minimum wage discussed above. Compare Industrial Welfare Commission, History of California Minimum Wage, available at http://www.dir.ca.gov/iwc/minimumwagehistory.htm, with Wage and Hour Division, U.S. Dep't of Labor, History of Federal Minimum Wage Rates Under the Fair Labor Standards Act, 1938-2009, available at http://www.dol.gov/whd/minwage/chart.htm. Further, commissions represented greater than half of Burden's total compensation at all times while he worked under the 2005 and 2007 Plans. Malik Decl. ¶¶ 4, 6-8.

the "retail or service" exemption).  Specifically, the DOL opined that a variety of financial institutions such as banks, personal loan companies, trust companies, building and loan associations, and insurance companies were not within the scope of the exemption for retail or service establishments.  Id.[6]

In 1961, Congress enacted the exemption which is now at issue, § 7(i) of the FLSA, now codified as 29 U.S.C. § 207(i).  Pub. L. 87-30, 75 Stat. 65 (1961) (originally enacted as 29 U.S.C § 207(h)).  Section 7(i), often referred to as the "retail or service exception," provides:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a *retail or service establishment* for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.  In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i) (emphasis added).  The legislative history following the 1961 amendment indicates that Congress intended that, for purposes of § 207(i), the term "retail or service establishment" is defined as set forth in § 213(a)(2).  See 29 C.F.R. §§ 779.24, 779.312, 779.411.[7]

---

[6] Subsequently in 1949, Congress amended § 13(a)(2) of the FLSA to exempt "any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located.  A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sale of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."  29 U.S.C.A. § 213(a)(2).

[7] In 1989, Congress repealed § 213(a)(2) in 1989.  See Pub. L. No. 101-157, § 3(c)(1), 103 Stat. 938, 939 (1989).  Notwithstanding said repeal, courts have held that the definition previously set forth in § 213(a)(2) still applies where the phrase "retail or service establishment" appears elsewhere in the FLSA, including in § 207(i).  Gieg v. DRR, Inc., 407 F.3d 1038, 1047 (9th Cir. 2005); Reich v. Delcorp. Inc., 3 F.3d 1181, 1183 (8th Cir. 1993).

The DOL's interpretive regulations identify three characteristics of a retail or service establishment: (1) it typically "sells goods or services to the general public," (2) "serves the everyday needs of the community in which it is located," and (3) "performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process." 29 C.F.R. § 779.318(a). DOL regulations also provides a "partial list" of establishments "to which the retail concept does *not* apply," such as accounting firms, brokers, building contractors, common carriers, insurance brokers and agents, doctors, dentists, pharmacists, and other medical providers, schools, telephone companies, and travel agencies. Id. § 779.317 (emphasis added). These types of businesses are deemed to fall outside the ambit of the exemption afforded by the retail or service exemption. See Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295 (1959).

The Supreme Court has counseled that exemptions from the FLSA for retail or service establishments "are to be narrowly construed against the employers seeking to assert them, and their application limited to those plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S 388, 392 (1960). The employer has the burden of demonstrating that it is eligible for the retail commission exception. Mitchell, 359 U.S. at 295-96. Federal courts generally defer to the DOL's regulations, as long as they represent a reasonable construction of the statute. Martin v. Refrigeration School, Inc., 968 F.2d 3, 5 (9th Cir. 1992) (citing Chevron USA, Inc. v. NRDC, 467 U.S. 837, 844 (1984)).

**2.     Analysis**

Section 779.317 expressly identifies "insurance" as being among the "list of establishments to which the retail concept does *not* apply." 29 C.F.R. § 779.317 (identifying: "Brokers, custom house; freight brokers; *insurance brokers*, stock or commodity brokers" and "*Insurance*; mutual, stock and fraternal benefit, including *insurance brokers*, agents, and claims adjustment offices.") (emphasis added). SelectQuote acknowledges that "[i]nsurance" and "insurance brokers" are expressly identified in

1  § 779.317, but nonetheless asserts that § 779.317 is inapposite because it is operating a
2  "new type of business" that is "not covered by the Insurance Industry exclusion from the
3  'retail concept' in the FLSA regulations." Mot. at 18.
4       As support for its position, SelectQuote relies principally on two out-of-circuit cases,
5  which ostensibly concluded that a business lacking a retail concept under § 779.317 may
6  nonetheless qualify for the retail or service exemption. Mot. at 18-19. In Hodgson v.
7  Centralized Servs., Inc., 457 F.2d 824 (4th Cir. 1972), the court held that an income tax
8  preparation service qualified as a retail or service establishment under the FLSA,
9  notwithstanding a prior DOL interpretation stating that "accounting firms" lacked the retail
10 concept. Id., 457 F.2d at 827. In reaching its decision, the court noted that the DOL'S pre-
11 1949 exclusion of "accounting firms" should not "arbitrarily embrace the unsophisticated
12 business activities of the defendants in an area of service which came into being and had
13 developed throughout the country only during the past decade." Id.
14      In Selz v. Investools, Inc., No. 2:09-CV-1042 TS, 2011 WL 285801 (D. Utah Jan.
15 27, 2011), the court ruled that a company that marketed products and services to educate
16 individuals on how to personally invest in exchange markets online and aid them in doing
17 so did not qualify as one of the specific establishments exempt from the retail exception.
18 While noting that that § 779.317 specifies that educational institutions, finance companies
19 and investment counseling firms lack a retail concept, the employer, "as a *marketer of*
20 *materials* that teach and aid individuals to do their own financial investing, does not fit into
21 the traditional concept of an educational institution, such as a for-profit university; a
22 finance company, such as a bank; or an investment counseling firm." Id. at *6 (emphasis
23 added). The court concluded that "marketing tools to aid individuals in independently
24 investing personal funds is its own industry" and therefore § 779.317 was not a bar to the
25 FLSA exemption afforded under 29 U.S.C. § 317(i). Id.
26      SelectQuote claims that like the businesses in Hodgson and Selz, it too has
27 developed a business model that is not encompassed in § 779.317. According to
28 SelectQuote, its direct marketing approach "turned the life insurance industry on its head"

by having its agents contact prospective customers by telephone instead of in person—more like the independent broker model traditionally existing in the property and casualty insurance business. Mot. at 2. In SelectQuote's words, "One of the old adages in the insurance industry before 1985 was that property and casualty insurance was bought and life insurance was sold. SelectQuote's insight was to change that paradigm so that life insurance too could just be bought by the average consumer." Id.

SelectQuote's self-aggrandizing arguments for avoiding the preclusive effect of § 779.317 are unavailing. In both Hodgson and Selz, the type of businesses operated by the defendants did not previously exist. In Hodgson, the court noted that the defendant's tax preparation service had then only come into existence within a relatively recent period of time. 457 F.2d at 827. Likewise, in Selz, the court focused on the fact that the defendant's business of selling do-it-yourself investment materials did not fall under the rubric of a bank, finance company or educational institution. 2011 WL 285801, at *6. In contrast, SelectQuote's business bears none of the hallmarks of a new type of business establishment. Although SelectQuote has changed the method by which an agent sells life insurance—namely, directly by telephone instead of face-to-face—*the fact remains that SelectQuote is still selling life insurance*.

Moreover, SelectQuote's own statements purporting to explain why its business supposedly is so revolutionary underscores the logical flaws in its argument. Section 779.317 identifies "Insurance" and "insurance brokers"—*not* "life insurance" or "term life insurance"— as establishments lacking a retail concept. See 29 C.F.R. § 779.317. Ironically, what SelectQuote claims to be "new" is not new at all; rather, as SelectQuote itself acknowledges, it simply is employing direct marketing methods that have long been used in the property and casualty insurance business. Singh Decl. ¶ 5. In other words, SelectQuote has made life insurance sales *more like* the traditional insurance brokerages, which clearly are within the scope of § 779.317. In Hodgson and Selz, the defendants changed a specifically-listed industry so fundamentally as to distinguish it from an industry listed in section 779.317. See Selz, 2011 WL 285801, at *6; Hodgson, 457 F.2d at 827.

1  The logic of those cases does not apply in cases such as the present, where a company
2  simply has changed its business to be *more like* a business which indisputably falls within
3  the scope of § 779.317.   For these reasons, the Court finds that SelectQuote falls within the
4  insurance brokerage industry that section 779.317 finds to lack the requisite retail concept
5  to qualify for an exemption from the FLSA's overtime requirements.

### 3. Rational Basis

7  As an alternative matter, SelectQuote argues that the Court should decline to apply
8  § 779.317 on the ground that it lacks a rational basis for concluding that insurance
9  establishments are not exempt as a retail or service establishment.  Mot. at 20-22.
10 According to SelectQuote, "[s]ection 779.317 is an 'antiquated interpretation' that does not
11 take into account the fundamental changes over the past four decades regarding what is
12 considered a 'retail or service establishment,' and it should not preclude SelectQuote from
13 applying the section 7(i) exemption to Burden."  Id. at 22.

14 To support its position, SelectQuote points to cases where courts have declined to
15 defer to the DOL's list of non-retail establishments set forth in § 779.317 where there is no
16 discernable rational basis for the DOL's determination that type of business lacks a retail
17 concept.  See Martin v. The Refrigeration Sch., Inc., 968 F.2d 3 (9th Cir. 1992) (holding
18 that there was no rational basis for § 779.317's distinction that "[s]chools (*except* schools
19 for mentally or physically handicapped or gifted children)" lack a retail concept); Reich v.
20 Cruises Only, Inc., 1997 WL 1507504, at *5 (M.D. Fla. June 5, 1997) (finding that there
21 was no rational basis for the DOL's inclusion of "[t]ravel agencies" as establishments
22 lacking a retail concept).  However, these cases are distinguishable in that they did not
23 involve the insurance industry.  Moreover, the Supreme Court has held that the inclusion of
24 financial companies, including insurance establishments, in § 779.317 is proper.  See
25 Mitchell, 359 U.S. at 290-91.

26 In light of the above, the Court finds that § 779.317 is a persuasive embodiment of
27 the Department of Labor's "body of experience and informed judgment."  See Skidmore,
28 323 U.S. at 140.  The Court further finds that SelectQuote has not shown "plainly and

unmistakably" that Burden's exemption was within the "terms and spirit" of the FLSA. See Arnold, 361 U.S. at 392.  As an insurance broker, SelectQuote is not a "retail or service establishment" and thus is not exempt from the FLSA's overtime requirements.  See 29 U.S.C. § 207(a); 29 C.F.R. § 779.317.  Therefore, SelectQuote is not entitled to summary judgment of Burden's second cause of action.  See Fed. R. Civ. P. 56(a).

### C. REMAINING CLAIMS

SelectQuote argues that Burden's third cause of action for failure to pay all wages owed upon termination and fourth cause of action for unfair competition must fail because they are derivative of his overtime claims.  See Mot. at 23; Reply at 14.  Because Burden's second cause of action survives SelectQuote summary judgment motion, SelectQuote is not entitled to judgment as a matter of law on Burden's derivative claims to the extent they are predicated on the FLSA.  Cf. Steinhebel v. L.A. Times Commc'ns, LLC, 126 Cal. App. 4th 696, 712 (2005).  Therefore, the Court finds that SelectQuote is not entitled to summary judgment as to Burden's third and fourth causes of action.

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT

1. SelectQuote's motion for summary judgment is GRANTED as to Plaintiff's first cause of action and DENIED as to all other claims.

2. The parties shall appear for a telephonic Case Management Conference on **February 8, 2012 at 3:00 p.m.**  Prior to the date scheduled for the conference, the parties shall meet and confer and prepare a joint Case Management Conference Statement which complies with the Standing Order for All Judges of the Northern District of California and the Standing Orders of this Court.  Plaintiff shall assume responsibility for filing the joint statement no less than seven (7) days prior to the conference date.  Plaintiff's counsel is to set up the conference call with all the parties on the line and call chambers at (510) 637-3559. NO PARTY SHALL CONTACT CHAMBERS DIRECTLY WITHOUT PRIOR AUTHORIZATION OF THE COURT.

1      3.     This Order terminates Docket 34 and 55.

2      IT IS SO ORDERED.

3  Dated: January 23, 2012

4                                                                 _____
                                                                  SAUNDRA BROWN ARMSTRONG
                                                                  United States District Judge